UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kara Lea Maynard

    v.                           Civil No. 17-cv-087-PB
                                        Opinion No. 2018 DNH 030
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

## MEMORANDUM AND ORDER

Pursuant to 42 U.S.C. § 405(g), Kara Maynard moves to reverse the decision of the Acting Commissioner of the Social Security Administration ("SSA") to deny her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423.  The Acting Commissioner, in turn, moves for an order affirming her decision.  For the reasons that follow, this matter is remanded to the Acting Commissioner for further proceedings consistent with this Memorandum and Order.

## I. Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . .

42 U.S.C. § 405(g). Nevertheless, the court "must uphold a
denial of social security disability benefits unless 'the
[Acting Commissioner] has committed a legal or factual error in
evaluating a particular claim.'" Manso-Pizarro v. Sec'y of
Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per
curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).
As for the statutory requirement that the Acting Commissioner's
findings of fact be supported by substantial evidence, "[t]he
substantial evidence test applies not only to findings of basic
evidentiary facts, but also to inferences and conclusions drawn
from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916,
917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727,
730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more
than [a] mere scintilla. It means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.'" Currier v. Sec'y of Health, Educ. & Welfare, 612
F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales,
402 U.S. 389, 401 (1971)). However, "[i]t is the responsibility
of the [Acting Commissioner] to determine issues of credibility
and to draw inferences from the record evidence. Indeed, the
resolution of conflicts in the evidence is for the [Acting
Commissioner], not the courts." Irlanda Ortiz v. Sec'y of

2

Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted). The court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988) (per curiam). Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

## II. **Background**

Maynard was born in 1979. She last worked in April of 2006 in customer service. In March 2010, she applied for disability insurance benefits ("DIB"), and she identified the following medical conditions as limiting her ability to work: chronic dorsalgia;[1] congenital scoliosis;[2] recurrent migraines, including

---

[1] Dorsalgia is "pain in the back." Dorland's Illustrated Medical Dictionary 563 (32nd ed. 2012).

[2] Scoliosis is "[a]bnormal lateral and rotational curvature of the vertebral column." Stedman's Medical Dictionary 1734 (28th ed. 2006).

hemiplegic;[3] muscular spasms; hypothyroidism; myofascial etiology;[4] and extensive, incurable back pain and debilitating migraines. Doc. 12 at 1. While Maynard initially claimed to have become disabled on April 1, 2006, she has since amended her alleged onset date to November 1, 2008. Id. at 1, 17.

The SSA initially denied Maynard's claim, but she appealed the denial, and after a hearing before Administrative Law Judge ("ALJ") Edward Hoban, Maynard received a fully favorable decision on her claim in December 2011. Id. at 1. The SSA Appeals Council vacated ALJ Hoban's decision, and remanded with instructions to refer Maynard for a consultative examination ("CE").[5] Id. at 2. The SSA, in turn, sent Maynard to Dr. William Windler, who performed a CE in December 2012. Id. at 12; Administrative Transcript ("Tr.") 674. In his report on the examination he administered, Dr. Windler documented Maynard's complaints of whole-body pain, numbness, and tingling; migraine

---

[3] Hemiplegic migraines are "a form associated with transient hemiplegia." Stedman's, supra note 2, at 1212. Hemiplegia is "[p]aralysis of one side of the body." Id. at 866.

[4] Myofascial means "[o]f or relating to the fascia surrounding and separating muscle tissue." Stedman's, supra note 2, at 1272. Fascia is "[a] sheet of fibrous tissue that envelops the body beneath the skin; it also encloses muscles and groups of muscles and separates their several layers or groups." Id. at 700.

[5] "A consultative examination is a physical or mental examination or test purchased for [a claimant] at [the SSA's] request . . ." 20 C.F.R. § 404.1519.

headaches; light sensitivity; and depression.  Tr. 674-675.  He
also reported findings of diffuse tenderness: (1) over the
musculature of Maynard's neck; (2) over her abdomen; (3)
throughout her upper extremities; (4) over the paraspinous
muscles throughout her thoracolumbar spine; and (5) throughout
her lower extremities.[6]  Tr. 676.  Dr. Windler concluded his
report:  "She has diffuse aches and pains and tender points in
all four quadrants consistent with a fibromyalgia."  Tr. 676.
In a separate document, i.e., a Medical Source Statement of
Ability to Do Work-Related Activities (Physical), Dr. Windler
gave his opinions on Maynard's residual functional capacity
("RFC").[7]  Tr. 679-684.

     The record also includes a June 2013 letter addressed "To
whom it may concern," from Maynard's treating physician,
Concetta Oteri, D.O.  Tr. 794.  Maynard first saw Dr. Oteri in
September of 2008, complaining of cerumen impaction.[8]  Tr. 403.
In January of 2009, Maynard presented to Dr. Oteri "with

---

[6] More specifically, Dr. Windler found "some tenderness over
the greater trochanteric regions bilaterally" and "slight
tenderness with patellar manipulation."  Tr. 676.

[7] "Residual functional capacity" is a term of art that means
"the most [a claimant] can still do despite [her] limitations."
20 C.F.R. § 404.1545(a)(1).

[8] Cerumen is "[t]he soft, brownish yellow, waxy secretion (a
modified sebum) of the ceruminous glands of the external
auditory canal."  Stedman's, supra note 2, at 351.

symptoms that she had for quite a long time several years,"
including headaches with migraines, numbness, back pain,
significant fatigue and poor sleep quality.  Tr. 401.  Dr. Oteri
gave assessments of fatigue, paresthesia,[9] and back pain.  Tr.
401.  In addition, after noting that Maynard had never had a
"significant workup" regarding fibromyalgia, Dr. Oteri ordered a
battery of diagnostic tests.  Tr. 401.

In her June 2013 letter, Dr. Oteri listed a diagnosis of
fibromyalgia.  Tr. 794.  In support of that diagnosis, and
several others, Dr. Oteri reported the following symptoms:

> stroke-like migraine episodes, cognitive and memory
> impairment, hypersensitivity to hot and cold as well
> as climatic change, muscle fatigability, swollen and
> tender lymph nodes, movement disorder, chronic
> musculoskeletal pain, chronic fatigue, sleep
> disturbance, persistent muscle tenderness, irritable
> bowels including diarrhea and constipation, non-
> cardiac chest pain, sporadic throat soreness,
> recurring bursitis, balance and coordination problems,
> recurring migraines, clinical depression, neurological
> problems, anxiety and poor concentration.

Tr. 794.  Dr. Oteri continued:

> The diagnosis of Fibromyalgia is based on the
> following clinical findings: We did screening
> laboratory tests to exclude other medical conditions
> such as rheumatoid arthritis, myositis,
> hypothyroidism, multiple sclerosis, and lupus.  Also,
> The American College of Rheumatology ["ACR"] (Wolfe,
> et al. Arthritis & Rheumatism 33:160, 1990) has
> established general classification guidelines for

---

[9] Paresthesia is "[a] spontaneous abnormal usually
nonpainful sensation (e.g., burning, pricking); may be due to
lesions of both the central and peripheral nervous systems."
Stedman's, supra note 2, at 1425.

Fibromyalgia.  These guidelines require that
widespread aching be present for at least 3 months and
a minimum of 11 out of 18 tender points be met and the
patient meets both of these criteria including at
least 16 of the 18 tender points on each examination.

Tr. 795.  Furthermore, Dr. Oteri noted that "[a]ntidepressant
medications are the most frequently used and best studied drugs
for the treatment of ME/CFS and Fibromyalgia,"[10] and then then
went on to describe a largely unsuccessful course of
antidepressant medications she had prescribed for Maynard.  Tr.
795.  Dr. Oteri's contemporaneous treatment notes from 2013, in
turn, fully document her statements that beginning in 2009, she
gave Maynard prescriptions for Cymbalta,[11] Amitriptyline,[12] and
Celexa.[13]  Tr. 795.  Dr. Oteri concluded her letter with an

---

[10] ME/CFS stands for myalgic encephalomyelitis/chronic
fatigue syndrome.  Encephalomyelitis is an "[i]nflammation of
the brain and spinal cord."  Stedman's, supra note 2, at 635.
Myalgia is "[m]uscular pain."  Id. at 1265.

[11] Cymbalta is a "trademark for a preparation of duloxetine
hydrochloride."  Dorland's, supra note 1, at 457.  Duloxetine
hydrochloride is "a serotonin-norepinephrine reuptake inhibitor,
used for the treatment of major depressive disorder."  Id. at
572.

[12] Amitriptyline hydrochloride is "[a] chemical compound of
the tricyclic antidepressant class that can be used to treat
some sleep disorders and neurogenic pain syndromes."  Stedman's,
supra note 2, at 63.

[13] Celexa is a "trademark for a preparation of citalopram
hydrobromide."  Dorland's, supra note 1, at 312.  Citalopram
hydrobromide is "a selective serotonin reuptake inhibitor . . .
used as an antidepressant."  Id. at 366.

opinion on Maynard's ability to work.  Tr. 797-798.

In June 2013, Maynard received a second hearing before a
different ALJ, Thomas Merrill.  Doc. 12 at 2.  A month later, he
denied Maynard's claim.  In his decision, the ALJ determined
that Maynard had the severe impairments of migraines and chronic
low back pain.  Tr. 13.  He also noted that Maynard had alleged
limitations due to fibromyalgia.  While he did not determine
that her fibromyalgia was a severe impairment, he did consider
the effects of fibromyalgia when determining Maynard's RFC.  Tr.
13.  With regard to the medical opinion evidence, the ALJ gave:
(1) significant weight to the opinion of Dr. Arthur Brovender,
an orthopedic surgeon, who examined some of Maynard's medical
records and testified, by telephone, at her 2013 hearing; (2)
significant weight to the opinion of Dr. Hugh Fairley, a state-
agency consultant who examined some of Maynard's medical records
and prepared an assessment of her physical RFC in August of
2010;[14] (3) limited weight to opinions rendered by Dr. Oteri in
2010 and 2013; and (4) limited weight to the opinions rendered
by Dr. William Windler after his 2012 CE.  Tr. 17-18.

Maynard appealed.  In an order dated October 7, 2015, Judge
McCafferty reversed the ALJ's decision on grounds that he had

_____

[14] As it happens, in his favorable decision from 2011, ALJ
Hoban had discounted Dr. Fairley's opinion.  See Maynard v.
Colvin, 2015 DNH 192, at *3.

improperly weighed the expert-opinion evidence.  See Maynard v. Colvin, 2015 DNH 192, at *12.  Judge McCafferty also noted, and the Acting Commissioner conceded, that when evaluating Maynard's claim, "the ALJ did not apply the relevant SSA guidelines for evaluating DIB claims based upon fibromyalgia."  Id. at 12. Judge McCafferty went on to say that "[o]n remand, the ALJ should apply Social Security Ruling ['SSR'] 12-2p, 'Evaluation of Fibromyalgia,' when considering Maynard's claim."  Id.  After Judge McCafferty issued her order, the SSA Appeals Council issued an order "remand[ing] [Maynard's] case to an [ALJ] for further proceedings consistent with the order of the court." Tr. 907.

On remand, Maynard obtained and submitted three more opinions from Dr. Oteri.  Tr. 838.  Each opinion was dated June 1, 2016, and each was submitted on a form that was captioned "Physical Medical Source Statement," and that had a hand-written notation above the caption.  One notation said: "Please fill out as of Nov. 1, 2008."  Tr. 1168.  Another notation said: "Please fill out as of Nov. 1, 2008 to current."  Tr. 1178.  And the third notation said: "Please fill out as of current."  Tr. 1173. At Maynard's June 2016 hearing (her second before ALJ Merrill and her third overall), a vocational expert testified that a person with the limitations described in Dr. Oteri's retrospective Medical Source Statement would be unable to meet

the demands of any job.  Tr. 855-856.

After Maynard's hearing, the ALJ issued a decision in which he evaluated all the opinions he had considered in his 2013 decision, and gave them essentially the same weight he had given them in 2013.[15]  In addition, the he gave "little weight" to each of the three new opinions from Dr. Oteri that Maynard submitted in anticipation of her 2016 hearing.  Tr. 822.

With respect to fibromyalgia, the ALJ found "that the evidence does not support a finding [that] fibromyalgia meets the criteria to be considered as a medically determinable impairment."  Tr. 815.  He then gave the following assessment of Maynard's RFC:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she has the ability to stand and walk for two hours each and sit for six hours in an eight hour workday, with unlimited use of hands or feet to operate controls and to push/pull.  She is unable to crawl or climb ladders, ropes and scaffolds, and she is able to occasionally balance, stoop, kneel, crouch, and climb ramps and stairs.  She must avoid unprotected heights.

Tr. 817.  On the basis of the foregoing RFC, the ALJ determined, just as he had in his previous decision, that Maynard was capable of performing her past relevant work as a customer

---

[15] While this is probably a distinction without a difference, the ALJ gave "significant" weight to the opinions of Dr. Brovender and Dr. Fairley in 2013, but gave "substantial" weight to those opinions in 2016.  See Tr. 17, 823, 824.

service representative.  Tr. 825.


# III.  <u>Discussion</u>

## A.    <u>The Legal Framework</u>

To be eligible for disability insurance benefits, a person

must: (1) be insured for such benefits; (2) not have reached

retirement age; (3) have filed an application; and (4) be under

a disability.  42 U.S.C. §§ 423(a)(1)(A)-(E).  The only question

in this case is whether the ALJ correctly determined that

Maynard "was not under a disability, as defined in the Social

Security Act, at any time from April 1, 2006, the alleged onset

date, through December 31, 2010, the date last insured," Tr.

825.[16]

To decide whether a claimant is disabled for the purpose of

determining eligibility for DIB, an ALJ is required to employ a

five-step process.  <u>See</u> 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional

---

[16] Earlier in his decision, the ALJ stated that "[b]efore
the current hearing in this matter, the claimant amended her
alleged onset date [from April 1, 2006] to November 1, 2008," so
it is not clear why he used the 2006 date in his conclusion.
Tr. 808.

capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20
C.F.R. § 416.920, which outlines the five-step process for
Supplemental Security Income, which is the same as the one
prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is
disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). She
must do so by a preponderance of the evidence. See Mandziej v.
Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)). Finally,

[i]n assessing a disability claim, the [Commissioner]
considers objective and subjective factors, including:
(1) objective medical facts; (2) [claimant's]
subjective claims of pain and disability as supported
by the testimony of the claimant or other witness; and
(3) the [claimant]'s educational background, age, and
work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of Health &
Human Servs., 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v.
Sec'y of Health & Human Servs., 690 F.2d 5, 6 (1st Cir. 1982)).

B.   **Maynard's Claims**

Maynard claims that the ALJ erred by: (1) determining that
her fibromyalgia was not a medically determinable impairment
("MDI"); (2) improperly weighing the expert-opinion evidence;

and (3) improperly weighing the "other source" evidence. Maynard's first claim is persuasive and dispositive.

1.  Fibromyalgia as an MDI

In her order remanding Maynard's case to the SSA, Judge McCafferty directed the ALJ to apply SSR 12-2p when considering Maynard's claim. Maynard v. Colvin, 2015 DNH 192, at *12. The ALJ did so, and determined that Maynard's purported fibromyalgia ("FM") was not an MDI. Tr. 811-813.

According to the applicable regulations, an MDI "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. For that reason, an MDI "must be established by objective medical evidence from an acceptable medical source." Id. When the potential MDI at issue is fibromyalgia, "[a] licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence." SSR 12-2p, 2012 WL 3104869, at *2 (S.S.A. July 25, 2012). SSR 12-2p goes on to explain that the SSA "will find that a person has an MDI of FM if the physician diagnosed FM and provides the evidence [the SSA] describe[s] in section II.A. or section II.B., and the physician's diagnosis is not inconsistent with the other evidence in the person's case record." Id.

Section II.A. of SSR 12-2p is based upon "[t]he 1990 ACR

13

[American College of Rheumatology] Criteria for the
Classification of Fibromyalgia," and provides that FM may be an
MDI if a claimant: (1) has "[a] history of widespread pain . . .
that has persisted (or that persisted) for at least 3 months"[17];
(2) has "[a]t least 11 [of 18] positive tender points on
physical examination"[18]; and (3) produces "[e]vidence that other
disorders that could cause the symptoms or signs were excluded."
SSR 12-2p, 2012 WL 3104869, at *2-*3.

Section II.B. is based upon "[t]he 2010 ACR Preliminary
Diagnostic Criteria," and provides that that FM may be an MDI if
a claimant: (1) has "[a] history of widespread pain"; (2) has
"[r]epeated manifestations of six or more FM symptoms, signs, or
co-occurring conditions, especially manifestations of fatigue,
cognitive or memory problems ('fibro fog'), waking unrefreshed,
depression, anxiety disorder, or irritable bowel syndrome"[19]; and

---

[17] Widespread pain is "pain in all quadrants of the body
(the right and left sides of the body, both above and below the
waist) and axial skeletal pain (the cervical spine, anterior
chest, thoracic spine, or low back)." SSR 12-2p, 2012 WL
3104869, at *2.

[18] "The positive tender points must be found bilaterally (on
the left and right sides of the body) and both above and below
the waist." SSR 12-2p, 2012 WL 3104869, at *3.

[19] The applicable signs "include muscle pain, irritable
bowel syndrome, fatigue or tiredness, thinking or remembering
problems, muscle weakness, headache, pain or cramps in the
abdomen, numbness or tingling, dizziness, insomnia, depression,
constipation, pain in the upper abdomen, nausea, nervousness,
chest pain, blurred vision, fever, diarrhea, dry mouth, itching,

(3) produces "[e]vidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded." SSR 12-2p, 2012 WL 3104869, at *3.

The ALJ in this case determined that Maynard's fibromyalgia was not an MDI. It is not unusual for courts to affirm such determinations. For example, in Tozier v. Berryhill, the magistrate judge recommended affirming the ALJ's determination that FM was not an MDI where: (1) the ALJ found that "the record [did] not confirm that [the claimant had] the requisite number and location of tender trigger point findings and there [was] no evidence that medical doctors [had] excluded other impairments as required in [SSR] 12-2p,"; and (2) two doctors who reviewed the claimant's medical records found "that there was no examination confirming fibromyalgia by the requisite criteria." No. 1:16-cv-540-NT, 2017 WL 3331776, at *3-*4 (D. Me. Aug. 4, 2017) (quoting the record), adopted by No. 1:16-cv-540-NT, 2017

---

wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms." SSR 12-2p, 2012 WL 3104869, *3 at n.9. The applicable co-occurring conditions include "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." Id. *3 at n.10.

WL 4015652 (D. Me. Sept. 11, 2017). In Sinclair v. Berryhill, Judge Young affirmed the ALJ's determination that FM was not an MDI where the claimant did not produce evidence that: (1) any acceptable medical source had found the requisite number of tender points; (2) she had manifested the requisite number of FM signs, symptoms, or co-occurring conditions; or (3) any acceptable medical source had excluded other disorders that could have caused her signs or symptoms. See 266 F. Supp. 3d 545, 553-554 (D. Mass. 2017).

This case is distinguishable from both Tozier and Sinclair. Unlike the record in Tozier, the record in this case includes confirmation of the requisite number and location of trigger point findings (in Dr. Oteri's May 2013 letter) and evidence that a doctor excluded other impairments (also in Dr. Oteri's May 2013 letter). And while the record in Tozier included statements by two doctors to the effect that the claimant's medical records documented no examination confirming fibromyalgia by the relevant criteria, Judge McCafferty has already noted that Dr. Brovender's characterization of Dr. Windler's examination report as failing to discuss tender points was incorrect, see Maynard, 2015 WL 5838319, at *11, so this case lacks an analogue to the two doctors' statements in Tozier. And, in contrast with the record in Sinclair, the record in this case includes evidence that: (1) an acceptable medical source

16

(Dr. Oteri) found the requisite number of tender points; (2)
Maynard had manifested the requisite number of FM signs,
symptoms, or co-occurring conditions (reported in both Dr.
Windler's report[20] and Dr. Oteri's May 2013 letter[21]); and (3) an
acceptable medical source (Dr. Oteri) had excluded other
disorders that could have caused Maynard's signs or symptoms.

For his part, in support of his determination that
Maynard's purported FM was not an MDI, the ALJ focused on: (1)
Maynard's failure to claim that she was disabled as a result of
FM in any of her application materials; (2) Dr. Fairley's
observation that Maynard did not claim to be disabled due to FM;
(3) the lack of a diagnosis of FM in any medical record
generated prior to Maynard's date last insured, i.e., December
31, 2010; and (4) his determination that Maynard's medical
records, prior to her date last insured, did not document the
criteria necessary to establish FM, under the standard set out
in SSR 12-2p.  Tr. 813-814.  Then, in the section of his
decision devoted to opinion evidence, the ALJ discussed Dr.

---

[20] Dr. Windler reported manifestations of whole-body pain,
numbness, tingling, depression, light sensitivity, and migraine.
See Tr. 674-75.

[21] Dr. Oteri reported manifestations of irritable bowel
syndrome, thinking or remembering problems, muscle weakness,
insomnia, depression, constipation, chest pain, diarrhea,
anxiety disorder, chronic fatigue syndrome, and migraine.  See
Tr. 794.

Oteri's May 2013 letter, and assigned it little weight because:
(1) the letter was inconsistent with Dr. Oteri's examination
records during the time prior to Maynard's date last insured
because those records do not include a diagnosis of
fibromyalgia, a tender-point evaluation, or a four quadrant
evaluation; (2) Dr. Oteri is "an osteopathy [sic] and the record
includes no evaluation by a rheumatologist," Tr. 822; (3) the
letter falsely represents that Maynard was diagnosed with
fibromyalgia in 2009; (4) the letter represents that Maynard
"enrolled" as Dr. Oteri's patient in 2009 when, in fact, she had
been a patient in Dr. Oteri's practice since at least 2007; (5)
the letter reports diagnoses that do not appear in Dr. Oteri's
treatment notes; and (6) while the letter indicates that Maynard
experienced widespread aching for at least three months and had
at least 11 positive tender points on each examination, Dr.
Oteri's examination notes do not document either condition.  Tr.
822.

     The question before the court is whether the ALJ's
determination that Maynard's fibromyalgia was not an MDI is
supported by substantial evidence.  It is not.  In the remainder
of this section, the court begins by discussing the four reasons
the ALJ gave for determining that Maynard's FM was not an MDI,
and then turns to the six reasons he gave for assigning limited
weight to Dr. Oteri's opinions, including her appraisal of

Maynard's FM.

**a.    ALJ's reasons for determining that Maynard's fibromyalgia was not a medically determinable impairment**

> i.    <u>Maynard's failure to claim that she was disabled as a result of fibromyalgia in any of her application materials</u>

The ALJ does not explain how Maynard's failure to identify FM as a disabling impairment in her application materials has any bearing on the analysis mandated by SSR 12-2p, and the court can discern no way in which this fact would support a determination that Maynard's FM was not an MDI.

> ii.    <u>Dr. Fairley's observation that Maynard did not claim to be disabled due to fibromyalgia</u>

The ALJ does not explain how Dr. Fairley's observation that Maynard did not identify FM as a disabling impairment in her application materials has any bearing on the analysis mandated by SSR 12-2p, and the court can discern no way in which this fact would support a determination that Maynard's FM was not an MDI.

> iii.    <u>The lack of a diagnosis of fibromyalgia in any medical record generated prior to Maynard's date last insured, i.e., December 31, 2010</u>

The ALJ is correct in noting that no treating physician ever formally diagnosed Maynard with FM before December 31, 2010.  But the persuasive value of that fact is diminished to

19

the point of insubstantiality by two facts the ALJ does not

mention: (1) in 2009, Dr. Oteri ordered diagnostic testing to

exclude disorders other than FM that could have caused Maynard's

signs and symptoms;[22] and (2) starting in 2009, Dr. Oteri

prescribed a course of treatment, i.e., antidepressant

medication, that is indicated for FM.

> iv.  The ALJ's determination that
> Maynard's medical records, prior to her date
> last insured, did not document the criteria
> necessary to establish FM, under the standard
> set out in SSR 12-2p

As the court has already noted, before Maynard's date last

insured, Dr. Oteri had excluded other conditions that could have

caused Maynard's signs and symptoms and had initiated a course

of treatment that is indicated for FM.  Thus, the lack of

documentation in Maynard's medical records that fully supports

an SSR 12-2p analysis is not substantial evidence that Maynard's

FM was not an MDI.

**b.  ALJ's reasons for giving limited weight to
Dr. Oteri's opinions**

> i.  The purported inconsistency between
> Dr. Oteri's May 2013 letter and her examination
> records during the time prior to Maynard's date
> last insured (which do not include a diagnosis

---

[22] In her May 2013 letter, Dr. Oteri explained: "We did
screening laboratory tests to exclude other medical conditions
such as rheumatoid arthritis, myositis, hypothyroidism, multiple
sclerosis, and lupus."  Tr. 795.

<u>of fibromyalgia, a tender-point evaluation,</u>
<u>or a four-quadrant evaluation)</u>

Again, Dr. Oteri's treatment records indicate that before Maynard's date last insured, Dr. Oteri had excluded other conditions that could have caused Maynard's signs and symptoms and had initiated a course of treatment that is indicated for FM.  Those aspects of Dr. Oteri's treatment records are entirely consistent with her May 2013 letter.  Moreover, while Dr. Oteri's treatment records do not include an express diagnosis of fibromyalgia, a tender-point evaluation, or a four-quadrant evaluation, those omissions only establish that Dr. Oteri's treatment records do not support the statements in her May 2013 letter, not that they are inconsistent with it.  Those records would be inconsistent if, for example, they had documented a tender-point evaluation that revealed 8 of 16 tender points rather than the 16 of 18 that Dr. Oteri mentioned in her letter. But, that is not the case here; the records are simply silent.

ii.  <u>Dr. Oteri's status as an osteopath and</u>
<u>the lack of any evaluation by rheumatologist</u>

SSR 12-2p does not say that evidence on fibromyalgia must come from a rheumatologist; it provides that "a medical or osteopathic doctor is the only acceptable medical source who can provide such evidence."  SSR 12-2p, 2012 WL 3104869, at *2.  Dr. Oteri is an osteopathic doctor.  Thus, she is an acceptable medical source, for the purposes of SSR 12-2p.

### iii. The May 2013 letter's representation that Dr. Oteri diagnosed Maynard with fibromyalgia in 2009

Given the court's determination that the lack of an express diagnosis of FM prior to Maynard's date last insured is not substantial evidence to support a determination that Maynard's FM was not an MDI, the court can discern no way in which the inaccuracy of the statement in Dr. Oteri's May 2013 letter about a 2009 diagnosis would support a determination that Maynard's FM was not an MDI.

### iv. The May 2013 letter's representation that Maynard "enrolled" as Dr. Oteri's patient in 2009 when, in fact, she had been a patient in Dr. Oteri's practice since at least 2007

The court can discern no way in which the purported inaccuracy of the statement in Dr. Oteri's May 2013 letter about when Maynard became her patient would support a determination that Maynard's FM was not an MDI.

### v. The May 2013 letter's references to diagnoses that do not appear in Dr. Oteri's treatment notes

The only diagnosis that matters is fibromyalgia, and the court has already explained why the lack of an express diagnosis of FM in Dr. Oteri's treatment notes does not support a determination that Maynard's FM was not an MDI.

### vi. The lack of substantiation in Dr. Oteri's examination notes for her statements, in the 2013 letter, that Maynard experienced widespread aching for at least three months and

<u>had 16 positive tender points on each examination</u>

SSR 12-2p provides that a determination that fibromyalgia is an MDI must come from an acceptable medical source. Dr. Oteri is an acceptable medical source who provided evidence that prior to Maynard's date last insured, she experienced widespread aching for at least three months and had 16 FM tender points. SSR 12-2p requires evidence from an acceptable medical source, but there is nothing in SSR-2p to suggest that Dr. Oteri's retrospective evidence is somehow invalid because the findings she reported were not documented in her examination notes. To be sure, SSR 12-2p provides that the SSA "will review the physician's treatment notes to see if they are consistent with the diagnosis of FM," 2012 WL 3104869, at *2, but it is difficult to see how treatment for fibromyalgia in the form of antidepressant medication, prescribed after diagnostic testing to exclude other impairments, is inconsistent with a diagnosis of FM. Accordingly, the lack of substantiation in Dr. Oteri's examination notes for her subsequent findings concerning widespread aching and tender points does not support a determination that Maynard's FM was not an MDI.

In sum, the ALJ's determination that Maynard's fibromyalgia does not qualify as an MDI is not supported by substantial evidence. Given the degree to which the decision as to whether or not FM is an MDI reverberates through the sequential

evaluation process, see SSR 12-2p, 2012 WL 3104869, at *5-6, the ALJ's failure to make a determination that is supported by substantial evidence merits a remand.

2. Evaluation of Medical Expert Opinions

Because this case is being remanded for the reasons given above, the court need not dwell on the manner in which the ALJ evaluated the expert medical opinions, but because that issue was the basis for Judge McCafferty's remand, the court will deal with it briefly.

a. Dr. Windler's Opinion

In December 2012, in conjunction with his consultative examination, Dr. Windler completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). Tr. 679-684. Judge McCafferty described the opinions in Dr. Windler's Medical Source Statement:

> [H]e opined that Maynard could sit for about 30 minutes at a time and stand or walk for about 15 minutes at a time. He also opined that she could sit, stand, and walk for a total of one hour each during the course of an eight-hour workday, and indicated that she would need to spend the remainder of an eight-hour work day reclining, lying down, or soaking in a warm tub.

Maynard, 2015 DNH 192, at *3. In his 2013 decision,

> [t]he ALJ gave "limited weight to the opinion of the consultative examiner, Dr. William Windler, M.D. . . . . because it [was] mostly conclusory, with little evidence cited to support his opinion of disability," because "[t]he functional limitations appear to be based solely on the claimant's self-reported limits,"

24

and because the "opinion . . . is inconsistent with [Dr. Windler's] own exam."

Id. at *10 (citation to the record omitted). Judge McCafferty determined that "[t]he ALJ's appraisal of Dr. Windler's opinion [was] not well supported." Id.

In his 2016 decision, the ALJ presents the very same analysis of Dr. Windler's opinion that Judge McCafferty rejected, with the following addition:

> [Dr. Windler] noted that [Maynard] did not bring a photo ID to the exam, and he did not state whether he reviewed the longitudinal medical records as required under SSR 12-2p, although he did mention some findings that he said were in her "chart."

Tr. 824.[23] If Dr. Windler mentioned findings in Maynard's chart, he necessarily reviewed her longitudinal medical records, and his Medical Source Statement includes six references to Maynard's medical history. See Maynard, 2015 DNH 192, at *4.

_____

[23] As an ancillary matter, it is not clear how the provisions of SSR 12-2p apply to the question of whether the ALJ evaluated Dr. Windler's opinion on Maynard's RFC in accordance with 20 C.F.R. § 404.1527. The "requirement" to which the ALJ refers appears to be directed to the evidence necessary to support a determination that fibromyalgia is an MDI. See SSR 12-2p, 2012 WL 3104869, at *1. Moreover, while SSR 12-2p states that "it is important that the medical source who conducts the [consultative examination] has access to longitudinal information about the [claimant]," it goes on to provide that the SSA "may rely on the CE report even if the person who conducts the CE did not have access to longitudinal evidence if [the SSA] determine[s] that the CE is the most probative evidence in the case record." Id. at *5. This suggests that access to longitudinal information is preferable, but not a "requirement."

Accordingly, the lack of a sentence specifically stating that Dr. Windler reviewed Maynard's longitudinal medical records is not a good reason for discrediting his opinion on Maynard's RFC. As for Maynard's failure to bring a photo ID to the CE, the court is a loss to see how that fact has any bearing on any relevant issue. In sum, the ALJ's 2016 evaluation of Dr. Windler's opinion does not appear to be any better supported than the evaluation that Judge McCafferty rejected in her order on the ALJ's 2013 decision.

### b. Dr. Oteri's 2013 Opinion

In her May 2013 letter, Dr. Oteri described the symptoms and clinical findings supporting her diagnosis of fibromyalgia and then went on to state that "[o]ral antidepressant medication therapy [was] not effective for [Maynard] and so we are using narcotic pain medication to control as much of the pain for [Maynard] as possible." Tr. 797. Dr. Oteri then opined that

> Maynard was completely and permanently disabled prior to [Dr. Oteri's] enrolling her as a patient in 2009, became unable to work due to her medical issues prior to [Dr. Oteri's] enrolling her as a patient in 2009, is unable to work in any capacity and . . . that her diseases and their effects prohibit her from even performing daily life activities and she needs to be on constant narcotic medications that do not allow her to work, even on a part time basis.

Tr. 797-98. In his 2013 decision,

> [t]he ALJ gave Dr. Oteri's opinions "limited weight because [they were] inconsistent with the claimant's diagnostic and clinical exams," because "the records

26

show that Dr. Oteri-Ahmadpour [was] a 'personal
friend' of the claimant," and because "her opinion
regarding the claimant's inability to perform daily
activities is not supported by the claimant's own
reported daily activities."

Maynard, 2015 DNH 192, at *7 (citations to the record omitted).

Judge McCafferty determined that "[t]he ALJ's appraisal of Dr.
Oteri's opinion [was] not well supported."  Id.

In his 2016 decision, the ALJ devoted a single paragraph to
Dr. Oteri's May 2013 letter.  Tr. 822.  The placement of that
paragraph suggests that the ALJ was evaluating Dr. Oteri's
opinion on Maynard's capacity for performing work-related
activities.  But the content of that paragraph – which touches
on few of the relevant 20 C.F.R. § 404.1527 factors – indicates
that the ALJ's primary focus was on whether Dr. Oteri's letter
supported a determination that Maynard had FM that qualified as
an MDI.  Rather than re-analyzing the ALJ's paragraph on Dr.
Oteri's letter to determine whether the ALJ properly discounted
Dr. Oteri's opinion on Maynard's capacity for performing work-
related activities, the court simply notes that on remand, the
ALJ should evaluate Dr. Oteri's May 2013 letter in accordance
with 20 C.F.R. § 404.1527.

## IV. Conclusion

For the reasons given, the Acting Commissioner's motion for
an order affirming her decision, doc. no. 13, is denied, and

Maynard's motion to reverse that decision, doc. no. 9, is granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of Court shall enter judgment in accordance with this Memorandum and Order and close the case.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


February 13, 2018

cc:  Janine Gawryl, Esq.
     T. David Plourde, Esq.